

LORNE STENSON,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )    No. 03 C 6642
                                  )
THE TOWN OF CICERO, BETTY         )    Judge Rebecca R. Pallmeyer
LOREN-MALTESE, THOMAS ROWAN,      )
GLENN WOLFF, and FRANK J. HIMEL,  )
                                  )
        Defendants.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lorne Stenson was fired from his position as a patrol officer with the Cicero Police Department after he spoke to federal authorities regarding their investigation into the traffic stop and arrest of Joseph Mario Moreno, a political opponent of Defendant Betty Loren-Maltese. In his nine-Count Amended Complaint, Stenson alleges that Defendant Town of Cicero (the "Town") conspired with Defendants Loren-Maltese, the President of the Board of the Town; Thomas Rowan, Superintendent of the Cicero Police Department; Glenn Wolff, First Deputy Chief of the Cicero Police Department; and Frank J. Himel, a private attorney, to deprive him of his rights to free speech and due process in violation of 42 U.S.C. § 1983 (Counts I, IV, and IX). Stenson also alleges a variety of state law claims, including (1) civil conspiracy against all Defendants (Count II); (2) intentional infliction of emotional distress, retaliatory discharge, and deprivation of rights guaranteed by the Illinois Constitution against the Town, Loren-Maltese, Rowan, and Wolff (Counts III, VII, and VIII); and (3) claims that the Town is liable for the acts of its officers under the laws of indemnification and respondeat superior (Counts V and VI). The Town, Loren-Maltese, and Himel have all separately moved to dismiss the claims against them. For the reasons set forth here, the motions are granted in part and denied in part.

## BACKGROUND

Stenson joined the Cicero Police Department ("Cicero PD") as a patrol officer in September 1999. His problems at work allegedly began on the night of December 15, 2000, when he was out on patrol alone in a squad car. (Cmplt. ¶¶ 3, 9.)[1] Shortly before 11:30 p.m., Stenson received a radio call from the Cicero PD dispatcher informing him that someone wanted to contact him on his cell phone. Stenson turned on his phone and around 11:30 p.m., he received a call from First Deputy Chief Wolff, the "second in command" at the Cicero PD. (Id. ¶¶ 10, 11.) Wolff gave Stenson a vehicle description – a black Lincoln Navigator with license plates bearing the name "Moreno" – and instructed him to proceed to Roosevelt Road and Laramie Street and await further instructions. Stenson asked if the call related to a narcotics operation but, according to Stenson, Wolff told him not to worry about it. (Id. ¶ 12.)

### A.    The Moreno Arrest

After Stenson arrived at Roosevelt Road and Laramie Street, Wolff called again and said that he (Wolff) had been following the Navigator because it was driving erratically, possibly due to driver intoxication. Wolff told Stenson to follow the vehicle when it passed and to pull the driver over if he felt there was probable cause to do so. Wolff stated that he wanted to remain on the line with Stenson while this occurred. (Id. ¶¶ 13, 14.) Soon thereafter, the Navigator drove by, followed by another car driven by an unidentified woman who, in Stenson's words, "gestured to Plaintiff towards the Navigator as she went past." (Id. ¶ 15.) Stenson followed the Navigator and observed it weaving and driving too closely to the vehicle in front of it. Stenson shared his observations with Wolff and stated that he felt he had probable cause to pull the driver over for driving under the influence of

---

[1]     Stenson's Amended Complaint is referred to as "Complaint" and cited as "Cmplt. ¶
___."

2

alcohol ("DUI"). Stenson again asked Wolff if this was a narcotics operation; Wolff told Stenson that he should just conduct the stop while Wolff remained on the line. (*Id.* ¶¶ 16, 17.)

Stenson stopped the Navigator and its two passengers – the driver and an unidentified woman. While standing near the driver's side window, Stenson could smell alcohol on the driver's breath. In addition, the driver's speech was slurred and he fumbled for his license; when Stenson examined the license, he observed that it restricted the driver to daytime hours, between 7:00 a.m. and 7:00 p.m. Stenson, who had never made a DUI arrest before this, consulted his field book and determined that he should direct the driver to exit the vehicle and take a field sobriety test. The driver failed two of three tests. (*Id.* ¶¶ 18, 19, 21.) At that point, another Cicero police officer, Officer Herrig, arrived at the scene.[2] Officer Herrig told Stenson that he also was not confident on the proper procedure for a DUI arrest. Stenson handcuffed the driver and Officer Herrig took the driver to his car because it was equipped to transport prisoners to the police station. (*Id.* ¶ 20.) In the meantime, the Navigator's female passenger assured Stenson that she was able to drive away safely, so Stenson returned to his squad car. By this time, Wolff was no longer on the cell phone line. (*Id.* ¶¶ 21, 22)

While Stenson was still parked at the arrest location, he received a call on his cell phone from Superintendent Rowan, "first in command" at the Cicero PD. (*Id.* ¶ 23.) Rowan asked Stenson "what he had," to which Stenson replied, a DUI. In light of the personal calls from Rowan and Wolff, Stenson thought that "this was something significant" and asked Rowan if it involved a narcotics operation. According to Stenson, Rowan told him not to worry about it and to return to the police station. (*Id.*)

---

[2]      The Complaint does not indicate Officer Herrig's first name or explain how he came to be at the scene.

When Stenson arrived at the station, Officer Polk (first name unknown) told him that Rowan wanted to assist him with the DUI paperwork. Stenson also learned from Officer Herrig that the driver he had arrested was Joseph Moreno, a Cook County Commissioner who was running against Betty Loren-Maltese for the position of President of the Board of the Town of Cicero. (*Id.* ¶¶ 24, 25, 32.) Rowan arrived at the station shortly afterwards and motioned Stenson to follow him to his office. Stenson asked Rowan if the night's event was politically motivated because Moreno was challenging Loren-Maltese for the Board presidency. (Apart from the identity of the arrestee, Stenson does not explain why he suspected a facially valid DUI arrest was somehow politically motivated.) Rowan again told Stenson not to worry and that he had done nothing wrong in performing his job and making a legitimate arrest. (*Id.* ¶ 26.) Stenson then "processed"[3] Moreno and drafted a case report on the arrest. (*Id.* ¶ 27.)

Stenson's shift was scheduled to end at 7:30 a.m. but at some point that morning, Rowan ordered him to be at the station at 9:00 a.m. for a media conference. When Stenson arrived for the conference, he first asked Rowan whether the DUI paperwork he had prepared was acceptable. Rowan reviewed the case report and approved its contents. He then instructed Stenson to go upstairs to the media conference but to remain quiet and let Rowan do all the talking. Stenson complied with the instruction. (*Id.* ¶¶ 27-29.) For reasons not explained in the Complaint, approximately two weeks later, Stenson was assigned to start reporting directly to Rowan. (*Id.* ¶ 30.)

---

[3]     The Complaint does not explain what Stenson did to "process" Moreno, who allegedly refused to take a Breathalyzer test or answer any questions. (Cmplt. ¶ 27.)

## B.	Investigation of the Moreno Arrest

On or about January 5, 2001, Stenson was pulled over by an unmarked car with no front license plate and an obscured rear license plate while he was driving through Maywood.[4] Two non-uniformed men wearing hats and dark glasses approached Stenson's car and ordered him to put his hands on the steering wheel. They also told him that if he reached for his gun, they would shoot him. Stenson assumed both men in fact had guns because each had a hand in his pocket pointing at Stenson. (Id. ¶ 31.) The men ordered Stenson out of the car, emptied his gun of bullets, and took his car keys. They then said, "see how easy it is to get hooked up in the county," "don't fuck with Moreno," and "the County runs the show around here." (Id.) The men threw Stenson's car keys into a snow bank and left. Throughout this incident, the men repeatedly warned Stenson not to look at them or their car. (Id.)

Stenson immediately called Rowan and told him about the encounter. The two men went to the Maywood police station and to the Cook County Sheriff's office to file complaints.[5] (Id. ¶ 33.) Rowan also called a press conference regarding the incident, which Stenson attended.[6] (Id. ¶ 34.) Shortly thereafter on January 10, 2001, Assistant Attorneys General Joelle Marasco and Robert Hunier, who were both assigned to prosecute the Moreno DUI case, met with Stenson at the Cicero police station to ask him about the Moreno arrest. Marasco and Hunier told Stenson that there was an allegation that he was involved in a conspiracy to frame Moreno, but they apparently did not disclose the source of the allegation. They also instructed Stenson to answer all questions with a

---

[4]	It is not clear whether Stenson was on duty at the time, or whether he was driving a squad car or some other vehicle. Nor is the court certain why Stenson responded to an unmarked car.

[5]	It is not clear who suggested that Stenson file the complaints.

[6]	The Complaint does not indicate when the press conference occurred, who spoke at the conference, or what was said.

5

"yes" or "no," and that they would inquire further if they wanted more information. During the interview, Marasco and Hunier asked Stenson if he had "received any phone calls prior to arresting Moreno as part of a conspiracy to frame Moreno." Stenson responded "no." (*Id.* ¶¶ 35, 36.) Stenson believes that Marasco and Hunier had information at that time that on the night of the arrest, Rowan and Wolff had engaged in surveillance of Moreno at a Chicago bar where he was sponsoring a Christmas party "as part of a conspiracy to arrest Moreno for political purposes." (*Id.* ¶ 37.)

After the January 10 meeting, Rowan took Stenson to eat at a restaurant in Berwyn and told him that the Town was hiring attorney Frank Himel to represent him. Stenson asked why he needed an attorney and Rowan explained that it was a precaution for his benefit, that he should not worry, and that he should meet with the attorney while on duty. (*Id.* ¶ 38.) At some point thereafter, Stenson met with Himel who said that he would represent Stenson at another meeting with the Assistant Attorneys General on February 13, 2001 and would speak on his behalf. Stenson asked if he had done anything wrong; Himel told him not to worry. He also advised Stenson, apparently without explanation, that the Moreno DUI case would be dismissed. (*Id.* ¶ 39.)

Sometime after this meeting, Rowan called Stenson into his office and told him that he and Stenson needed to meet with attorney Edward Vrdolyak at his office. Stenson "understood" that Vrdolyak represented the Town in legal matters and was a friend or associate of Loren-Maltese. At the meeting,[7] Vrdolyak assured Stenson that the Town was "backing him" and that if he cooperated, there would be no adverse affect on his job or his then-pending application to be a Chicago police officer. (*Id.* ¶ 40.)

---

[7]     Stenson does not say when the meeting took place.

6

On February 13, 2001, Stenson and Himel met with Marasco, Hunier, and two more senior members of the Attorney General's Office, Kleeman and Schwind.[8] (*Id.* ¶ 42.) Himel advised that Stenson would not answer any questions about what happened before the Moreno arrest and was invoking his Fifth Amendment right as to those matters. Himel also disclosed that Stenson had lied to Marasco and Hunier about not receiving any phone calls prior to arresting Moreno because he did not want to get any other officers in trouble. (*Id.* ¶ 43.) Stenson was unaware that Himel planned to make these statements and did not agree with them; nevertheless, he remained silent as Himel had instructed. After the meeting, Stenson asked Himel about the remarks. Himel explained that it was a legal strategy and that Stenson should not worry. (*Id.* ¶ 44.) Stenson later[9] told Rowan about the meeting and was again reassured that Loren-Maltese and the Town knew he had done nothing wrong. (*Id.* ¶ 45.)

## C.  Stenson Talks to the FBI

Shortly after the February 13, 2001 meeting, Rowan told Stenson that the Town was investigating the Moreno arrest and that he was being placed on administrative leave with full pay. Rowan once again reassured Stenson that Loren-Maltese and the Town knew that he had done nothing wrong and that Rowan was merely following standard policy and procedure by placing him on leave. (*Id.* ¶ 46.) While he was on leave, Stenson learned that the Federal Bureau of Investigations was looking into Moreno's arrest.[10] (*Id.* ¶ 47.) He also overheard part of a telephone

---

[8]      The Complaint does not provide Kleeman's or Schwind's first names, or specify their positions with the Attorney General's Office.

[9]      The Complaint does not indicate when Stenson spoke with Rowan or whether the conversation occurred in person or by phone.

[10]      The Complaint does not indicate when Stenson learned this information or from whom.

7

conversation between Rowan, Himel, and Vrdolyak,[11] but when Rowan saw Stenson, he immediately hung up the phone. Stenson asked why Rowan was talking to Himel, who was supposed to be representing Stenson. Rowan said that they were coordinating defenses, which made Stenson begin to worry that he was being set up as a "fall guy." (Id. ¶ 48.)

Some time later, Himel told Stenson that he would set up a meeting with the FBI.[12] (Id. ¶ 49.) When Himel later reported that the meeting would not occur, Stenson met with Himel and informed him that he wanted to speak with the FBI.[13] Himel became irate and told Stenson that they were not going to cooperate with the FBI because that could get Rowan and Wolff in trouble. (Id. ¶ 50.) Himel asked Stenson if he wanted to be considered a "rat," and warned that failure to cooperate with the Town would result in him "piss[ing] off" Loren-Maltese and "everyone else in Cicero," and losing his job. Against Stenson's wishes, Himel proceeded to fax a letter to the United States Attorney's Office stating that Stenson would not talk to them. (Id.) At that point, Stenson "began to realize that the Town of Cicero was planning to make Plaintiff the scapegoat for the entire Moreno affair." Stenson accused Himel of trying to frame him, and later sent him a letter terminating his services as legal counsel. Upon receiving the letter, Himel called Stenson and said that he was being paranoid and would lose his job if he remained uncooperative.[14] (Id. ¶¶ 51, 52.)

Despite Himel's threat, Stenson consulted another unidentified attorney who advised him to talk to the FBI. On February 22, 2001, Stenson went to the FBI and to the United States Attorney's

---

[11]     It is not clear how Stenson knew that Rowan was speaking to Himel and Vrdolyak. The Complaint does not indicate when the call occurred or what exactly Stenson overheard.

[12]     The Complaint does not indicate when Himel told Stenson about the FBI meeting or who suggested it.

[13]     Again, it is not clear when or where this meeting occurred.

[14]     The Complaint does not indicate when Stenson sent the letter, when Himel received it, or when Himel called Stenson.

Office[15] and told them about the cell phone calls he had received from Wolff and Rowan on the night of Moreno's arrest. (Id. ¶¶ 53, 54.) At some point after that meeting, Rowan ordered Stenson to accompany him to Vrdolyak's office. Once there, Rowan first went into the office alone. When he came back out, he instructed Stenson to enter the office, where Vrdolyak and two other attorneys, Terrence Gillespie and Edward Genson, were waiting. Vrdolyak told Stenson to consider all three men his attorneys. (Id. ¶ 55.) Either Gillespie or Genson asked Stenson what had transpired at his February 13 meeting with the Assistant Attorneys General and Stenson told them about it. The two attorneys then had a whispered conversation together, after which Gillespie told Stenson that he might need an attorney. Vrdolyak asked if Stenson was having trouble with Himel and offered to find him a better criminal attorney. He also reiterated that Stenson needed to cooperate with the Town or he would anger Loren-Maltese and lose his job. (Id. ¶ 56.)

On March 15, 2001, Stenson met a second time with unidentified members of the FBI and the United States Attorney's Office and answered questions about the Moreno arrest. Stenson again recounted the events as detailed above. (Id. ¶ 57.)

## D.     Stenson's Termination

In May 2001, two attorneys representing the Town, Michael Cainkar and Lawrence Pectar, questioned Stenson about the Moreno arrest and accused him of filing an "incomplete" case report. (Id. ¶ 58.) Soon thereafter, Rowan called Stenson and instructed him to meet at Rowan's squad car near Austin and 26th Street in Cicero. When Stenson arrived, Rowan asked him whether he had spoken with the FBI. Stenson said that he had, which made Rowan angry. Rowan told Stenson that he was causing problems and was going to lose his job, and at some point thereafter, took him back to Vrdolyak's office. (Id. ¶¶ 59, 60.) Stenson first met with Vrdolyak alone and

---

[15]     The Complaint does not identify the FBI agents or the Assistant United States Attorneys who met with Stenson.

acknowledged that he had spoken with the FBI. This made Vrdolyak angry as well and he, too, said that Stenson was causing problems and was going to lose his job. Vrdolyak told Stenson to leave the office and send in Rowan. (*Id.* ¶ 60.)

In mid-February 2002, Stenson went to the Cicero police station to pick up his paycheck.[16] Stenson saw Rowan and refused to shake his hand; Rowan said, "so that's how it's going to be," and walked away. At some point thereafter, Rowan spoke with Stenson and reiterated that he was going to lose his job because he cooperated with the FBI.[17] (*Id.* ¶¶ 61, 62.) Approximately one week later on February 20, 2002, Stenson was informed[18] that he was fired and received papers outlining various reasons for the termination, all relating to the Moreno arrest. (*Id.* ¶ 63.)

"In the wake of the Moreno affair," Rowan retired from the Cicero PD and Wolff left the Department after being demoted from his position as First Chief Deputy. In addition, Loren-Maltese was subsequently charged with, and convicted of "unrelated matters" and is now currently serving time in a federal prison. (*Id.* ¶¶ 64, 65.)

### E. Stenson's Lawsuit

On September 18, 2003, Stenson filed suit under 42 U.S.C. § 1983 against the Town, Loren-Maltese, Rowan, Wolff, and Himel, alleging that they violated his First Amendment rights by conspiring to discharge him in retaliation for speaking to the FBI and the United States Attorney's Office about the Moreno arrest. Specifically, Stenson claims that Defendants conspired to (Count IX), and did in fact violate his First Amendment right to engage in protected speech (Count I) and his Fourteenth Amendment right to due process (Count IV). Stenson also charges all Defendants with

---

[16]    It is not clear whether Stenson remained on administrative leave throughout this period.

[17]    The Complaint does not indicate when or where this conversation occurred.

[18]    The Complaint does not indicate who informed Stenson of the termination or how he was notified.

10

civil conspiracy (Count II), and he alleges state law claims against the Town, Loren-Maltese, Rowan, and Wolff for intentional infliction of emotional distress ("IIED"), retaliatory discharge, and deprivation of rights guaranteed by the Illinois Constitution (Counts III, VII, and VIII, respectively). Finally, Stenson alleges that the Town is liable for indemnification under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102 (Count V), and under a theory of respondeat superior (Count VI).

On January 29, 2004, Stenson filed an Amended Complaint that corrected the spelling of Himel's name but was otherwise identical to the original Complaint. Rowan answered the Amended Complaint (hereinafter "Complaint") on August 10, 2004; the Town, Loren-Maltese, and Himel all filed motions to dismiss, which are currently pending before the court.[19]

## DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion to dismiss for failure to state a claim, the court accepts as true all factual allegations in the plaintiff's complaint and draws all reasonable inferences in his favor. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 770 (7th Cir. 2002).

The Town, Loren-Maltese, and Himel seek dismissal of all Counts of Stenson's Complaint on a variety of grounds, including failure to state a claim, immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS

---

[19]     It does not appear that Wolff has responded to the Amended Complaint. On June 10, 2004, the court granted his agreed motion for additional time to answer or otherwise plead, (Minute Order of 6/10/04, Doc. No. 39), but there is no record that he ever did so.

11

10/1-101 et seq., preemption under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 et seq., untimeliness, and unclean hands. The court addresses each motion below.

## I.    The Town of Cicero

The Town advances several arguments in support of dismissal: (1) the § 1983 and state law conspiracy claims are barred by the intracorporate conspiracy doctrine; (2) the state law claims for IIED, retaliatory discharge, violation of the Illinois Constitution, and respondeat superior liability are barred by the Tort Immunity Act and preempted by the IHRA; (3) the § 1983 First Amendment claim fails because Stenson did not speak out on a matter of public concern; (4) there is no separate cause of action for indemnification under the Tort Immunity Act; and (5) all of Stenson's claims are barred by the doctrine of unclean hands. The court considers each argument in turn.

### A.    The Conspiracy Claims (Counts II and IX)

The Town first claims that Stenson has not alleged an unlawful conspiracy under state law (Count II) or for purposes of § 1983 (Count IX) because under the intracorporate conspiracy doctrine, "a conspiracy cannot exist solely between members of the same entity." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999). *See also Allen v. City of Chicago*, 828 F. Supp. 543, 564 (N.D. Ill. 1993) (applying intracorporate conspiracy doctrine to municipal corporation). The Town argues that it cannot be liable for conspiring with its employees Loren-Maltese, Rowan, and Wolff because the decision to discharge Stenson falls within the scope of their official duties. (Town Mem., at 4)[20] (citing *Tabor v. City of Chicago*, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998)) ("[E]mployees of a corporation who jointly pursue its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory.")

---

[20]    The Memorandum of Law in Support of Defendant's, Town of Cicero, Motion to Dismiss is cited as "Town Mem., at ___."

12

Stenson argues that the facts of this case fall within the two exceptions to the intracorporate conspiracy doctrine. First, the doctrine does not apply where employees are motivated solely by personal bias. *Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993) (where defendants acted solely out of personal animus, "the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment"). Second, the doctrine does not apply where there is a broad pattern of unconstitutional conduct that permeates the entity. *Id.* at 470-71 (citing *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir. 1988) (intracorporate conspiracy doctrine did not apply where the plaintiff alleged "numerous acts undertaken by several" corporate agents).

According to Stenson, the first exception applies here because this case involves a "'classic charge' of retaliation," which does not fall within the scope of employment. (Pl. Resp., at 10)[21] (citing *Fairley v. Andrews*, 300 F. Supp. 2d 660, 668-69 (N.D. Ill. 2004) (Castillo, J.)) ("We fail to comprehend how agreeing to harass and retaliate against employees is within the scope of Defendants' employment.") Stenson also claims that the second exception applies "[i]n light of the tidal wave of accusations that Cicero and Maltese's very *modus operandi* is retaliation similar to that alleged here." (Pl. Resp., at 11) (collecting cases involving allegations of retaliation against the Town of Cicero and/or Betty Loren-Maltese, including *Moreno v. Town of Cicero*, No. 01 C 1726, 2002 WL 31017932 (N.D. Ill. Sept. 5, 2002), *Schullo v. Town of Cicero*, No. 96 C 8136, 1999 WL 966105 (N.D. Ill. Oct. 13, 1999), and *Hanania v. Loren-Maltese*, 319 F. Supp. 2d 814 (N.D. Ill. 2004).)

The Seventh Circuit has not yet determined whether the intracorporate conspiracy doctrine applies to § 1983 cases. A majority of courts in this district have held that it does, *see Tabor*, 10 F.

---

[21]     Plaintiff's Combined Response to the Town's and Himel's Motions to Dismiss is cited as "Pl. Resp., at ___."

Supp. 2d at 994 (collecting cases), but questions remain as to its proper scope. Several courts have applied the doctrine where the defendants' position enabled their conduct, regardless of whether that conduct was wrongful. In *Doe v. Board of Ed. of Hononegah Community High Sch. Dist. No. 207*, 833 F. Supp. 1366 (N.D. Ill. 1993) (Reinhard, J.), for example, the plaintiff alleged that she was sexually abused by a teacher and that various school officials conspired to conceal the misconduct. The school administrators moved to dismiss the complaint arguing, among other things, that the § 1983 conspiracy claim was barred by the intracorporate conspiracy doctrine.

The court agreed, noting that the administrators were only able to influence the investigation into the teacher's misconduct by virtue of their employment positions. *Id.* at 1382. The plaintiff objected that the administrators' behavior was well outside the scope of their official corporate capacities, but the court was not persuaded.

> Here, defendants . . . could only have conspired to coverup or conceal the offending teacher's conduct within their official capacities as school administrators. They would have been in no position to have controlled or hindered any investigation into the teacher's conduct as individual citizens. Nor did they have any authority to take any action against the teacher outside their administrative roles.
>
> * * * *
>
> The test is not the wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within the scope of the conspirators' official duties. In this case it was.

*Id.* See also *David v. Village of Oak Lawn*, No. 95 C 7368, 1996 WL 210072, at *4 (N.D. Ill. Apr. 29, 1996) (Gettleman, J.) ("[T]he issue is whether the ability to injure the plaintiff was derived solely from the defendants' positions within their entity and the influence they wielded therefrom."); *Rojicek v. Community Consol. Sch. Dist. 15*, 934 F. Supp. 280 (N.D. Ill. 1996) (Alesia, J.) (doctrine barred conspiracy claim brought by discharged payroll specialist against school board officials).

Numerous other courts have declined to apply the doctrine where private citizens made allegations of police misconduct, even though the actions were presumably enabled by the officers'

positions. See, e.g., Newsome v. James, No. 96 C 7680, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) (Plunkett, J.) (doctrine did not bar § 1983 conspiracy claim based on allegation that police officers framed plaintiff for murder); Northen v. City of Chicago, No. 93 C 7013, 1999 WL 342441 (N.D. Ill. May 17, 1999) (Holderman, J.) (doctrine did not apply to claim that the city and its police officers conspired to falsely arrest plaintiff, a private citizen, without probable cause in retaliation for his making critical statements regarding the integrity and honesty of Chicago Police Department promotion examinations); Salto v. Mercado, No. 96 C 7168, 1997 WL 222874 (N.D. Ill. Apr. 24, 1997) (Zagel, J.) (declining to apply doctrine to case alleging conspiracy to physically abuse, falsely arrest, and retaliate against plaintiff, a private citizen, for complaining about police misconduct and filing a civil lawsuit). But see Farrar v. City of Chicago, No. 00 C 1675, 2001 WL 184979 (N.D. Ill. Feb. 22, 2001) (Plunkett, J.) (doctrine barred conspiracy claim brought by plaintiff alleging unlawful surveillance); David, 1996 WL 210072 (doctrine barred conspiracy claims against village and police officers accused of attacking and beating plaintiff during routine traffic stop).

In addition to these two lines of cases, Stenson cites a recent case where the court declined to apply the doctrine to a First Amendment retaliation claim. In Fairley v. Andrews, the plaintiffs worked as correctional officers at the Cook County Jail. On one occasion, plaintiff Fairley observed fellow correctional officers beating inmates so badly that they ended up in the jail's emergency room. 300 F. Supp. 2d at 662-63. When the inmates filed a lawsuit against the responsible officers, plaintiffs informed the officers that they would tell the truth if asked about the incident. Thereafter, the officers allegedly engaged in a campaign to harass and retaliate against the plaintiffs to prevent them from speaking out about the excessive use of force. For example, the officers repeatedly assigned plaintiff Fairley to dangerous assignments; denied him paternity leave; denied his requests to be paid for overtime; refused to let him use the restroom; swore at him; grabbed him from behind and imitated sexual acts; and failed to conduct an investigation after Fairley was attacked by an

inmate. They also spread rumors that plaintiff Gackowski was having an affair, and they threatened his life. *Id.* at 663. As a result of the harassment and retaliation, the plaintiffs resigned "out of fear for their own safety." *Id.* at 664.

The plaintiffs filed suit against the correctional officers alleging, among other things, that they had conspired to harass and retaliate against the plaintiffs in violation of § 1983. The defendants sought to dismiss the case on various grounds, including that liability was barred by the intracorporate conspiracy doctrine. *Id.* at 668. The court disagreed, "fail[ing] to comprehend how agreeing to harass and retaliate against employees is within the scope of Defendants' employment." *Id.* at 669 (citing *Emery v. Northeast Illinois Regional Commuter R.R. Corp.*, No. 02 C 9303, 2003 WL 22176077, at *4 (N.D. Ill. Sept. 18, 2003) ("[C]ourts facing § 1983 claims involving police misconduct have refused to apply the doctrine.")) In the court's view,

> [w]hile some of the retaliatory conduct – assigning double-duty shifts, denying paternity leave, investigations of misconduct—were routine, everyday decisions, the alleged agreement to harass and retaliate against Plaintiffs cannot be similarly described. Plaintiffs did not allege a conspiracy to assign double-duty shifts, but a conspiracy to deprive them of their First Amendment rights.

*Id.*

*Fairley* is arguably distinguishable on its facts because the defendants in that case allegedly conspired to prevent the plaintiffs from speaking out about police brutality in connection with an inmate lawsuit by harassing them over a several-month period. Stenson, conversely, alleges that Defendants conspired to discharge him, a single act presumably approved by one or more individuals, because he spoke to federal authorities months earlier about the Moreno arrest. Nevertheless, in the court's view, Stenson's allegations are arguably more comparable to the police misconduct cases discussed earlier, in which private citizens who spoke up about misconduct were targeted by police. *Compare Northen*, 1999 WL 342441; *Salto*, 1997 WL 222874. Though Stenson is not a private citizen, he charges Defendants with conspiring to set him up as the "fall guy" in the

Moreno investigation and, when that failed because he told the truth to federal authorities, conspiring to discharge him. At this stage of the proceedings, the court cannot say that Stenson's discharge was the sort of "routine, collaborative business decision" the intracorporate conspiracy doctrine is intended to protect.[22] *Fairley*, 300 F. Supp. 2d at 668 (quoting *Newsome*, 2000 WL 528475, at *15). Indeed, at this stage Defendants have not even identified the decisionmaker(s) nor proferred any official reason for the discharge. The Town's motion to dismiss Stenson's conspiracy claims (Counts II and IX) is therefore denied.[23]

## B. The State Law Claims (Counts III, VI, VII, and VIII)

The Town next seeks dismissal of Stenson's state law claims (Counts III, VI, VII, and VIII), arguing that Defendants are immune from suit under the Tort Immunity Act and, alternatively, that the claims are preempted by the Illinois Human Rights Act.[24]

---

[22]   As for Stenson's assertion that the alleged retaliation was part of a broader pattern of discriminatory conduct, however, his mere citation to a string of other lawsuits brought against the Town and Loren-Maltese is insufficient to trigger this exception to the intracorporate conspiracy doctrine. *Compare Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990) ("[M]embers of the Ku Klux Klan could not avoid liability by incorporating, for they would still be trying to organize (through persuasion or terror) multiple centers of social or economic influence."); *Boloun v. Williams*, No., 00 C 7584, 2002 WL 31426647, at *12 (N.D. Ill. Oct. 25, 2002) (exception applied where complaint alleged a conspiracy involving ten employees who engaged in numerous acts over a one-year period in order "to get" the plaintiff).

[23]   Stenson argues that the alleged conspiracy is not entirely "intracorporate" because Himel is a private attorney and not a Town official. The court agrees that Himel is not a Town official or agent merely because the Town hired him to represent Stenson. As explained *infra*, however, Stenson has not alleged a valid conspiracy claim against Himel and, thus, his purported participation in the conspiracy does not preclude application of the intracorporate conspiracy doctrine.

[24]   In its motion, the Town seeks dismissal of the state law claims on behalf of itself, Loren-Maltese, Rowan, and Wolff. As discussed *infra*, the court agrees that Counts II, III, VII, and VIII must be dismissed as against these individual Defendants for reasons not advanced by the Town. Thus, the court's discussion here addresses only whether the Town is immune from liability and, if not, whether the state law claims against it are nonetheless preempted by the IHRA.

17

## 1.    Tort Immunity Act

Section 2-109 of the Tort Immunity Act provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Under the Act, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. For § 2-201 to apply, a governmental employee's position may involve either determining policy or exercising discretion. *Arteman v. Clinton Community Unit Sch. Dist. No. 15*, 198 Ill. 2d 475, 484, 763 N.E.2d 756, 763 (2002); *Harinek v. 161 North Clark St. Ltd. Partnership*, 181 Ill. 2d 335, 341, 692 N.E.2d 1177, 1181 (1998). Immunity will not attach, however, unless the employee's act or omission leading to the alleged injury is "both a determination of policy and an exercise of discretion." *Arteman*, 198 Ill. 2d at 484, 763 N.E.2d at 763 (quoting *Harinek*, 181 Ill. 2d at 341, 692 N.E.2d at 1181).

A "policy decision" under the Act is one "requiring a governmental entity to balance competing interests and to make a judgment call as to what solution will best serve those interests." *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 379, 799 N.E.2d 273, 285 (2003). "Discretionary acts" are "those which are unique to a particular public office." *Snyder v. Curran Township*, 167 Ill. 2d 466, 474, 657 N.E.2d 988, 993 (1995); *Valentino v. Hilquist*, 337 Ill. App. 3d 461, 472, 785 N.E.2d 891, 901 (1st Dist. 2003). The Town argues that it is immune from liability in this case because Stenson's discharge "was the result of a policy decision made in the exercise of discretion by Defendant, Town of Cicero." (Town Mem., at 7) (citing *Johnson v. Mers*, 279 Ill. App. 3d 372, 380, 664 N.E.2d 668, 675 (1996)) (finding that hiring of a police officer is "inherently discretionary and is not performed on a given state of facts in a prescribed manner"). *See also Ellis v. City of Chicago*, 272 F. Supp. 2d 729, 736 (N.D. Ill. 2003) (City was immune from liability for discretionary decision

to discharge plaintiff because "the decision to fire someone involves balancing a set of given circumstances to arrive at an appropriate outcome; the outcome is not predetermined but left in the hands of an official to use proper judgment."); *Zinnermon v. City of Chicago Dep't of Police*, 209 F. Supp. 2d 908, 911 (N.D. Ill. 2002) (City was immune from retaliatory discharge claim because the alleged wrongdoing was "both discretionary and a determination of policy").

Stenson argues that any discussion of immunity is premature because no specific individual has yet "step[ped] forward to take responsibility for the actual decision to terminate Plaintiff as an affirmative exercise of her legitimate policy-making discretion." (Pl. Resp., at 12.) Stenson's logic is as follows: If Loren-Maltese is found to have interfered with the firing process and secretly ordered Stenson's termination, "that scenario . . . could hardly be characterized as a policymaking determination." (*Id.* at 12-13.) If, on the other hand, "discovery bears out that termination decisions are actually vested in Cicero's Town Board, then neither Wolff nor Rowan will be able to argue that they were exercising their policymaking discretion in firing Plaintiff." (*Id.* at 13.) In Stenson's view, "unless and until Defendants take an unequivocal position on these matters in discovery, their state law immunity argument is premature (particularly where it is not going to resolve the entire case against them anyway)." (*Id.*) (citing *Hanania v. Loren-Maltese*, 56 F. Supp. 2d 1010, 1017 (N.D. Ill. 1999) and *Alex R. v. Forrestville Valley Community Unit Sch. Dist. No. 221*, No. 02 C 50393, 2003 WL 22764877 (N.D. Ill. Nov. 19, 2003).)

Stenson's cited cases do not directly support the proposition that immunity turns on the identity of the government official(s) responsible for the decision to terminate his employment. In *Hanania*, for example, plaintiff Alison Resnick, the Cicero Town Collector, alleged that Loren-Maltese, the Cicero Board of Trustees, and others retaliated against her for making statements during Resnick's re-election campaign accusing Loren-Maltese and her allies of misconduct. 56 F. Supp. 2d at 1012. Resnick lost the campaign, but while she finished out her term, Loren-Maltese

and the Board allegedly eliminated the Town Collector's authority over business and pet licenses; moved the Town Collector's operation to smaller and inadequate quarters and denied Resnick access to files and equipment; transferred Resnick's responsibilities to the Collector-elect; and terminated two of her three employees. *Id.* In response, Resnick obtained a temporary restraining order to prevent Loren-Maltese from taking any action that would impede Resnick in the performance of her duties. The parties ultimately entered into a settlement agreement under which Loren-Maltese agreed to allow Resnick to complete her term without further interference. *Id.* at 1013.

Matters went smoothly for awhile, but then three weeks before Resnick's term ended, the Board declared a vacancy in the Town Collector's position and filled it, citing Resnick's excessive absences from Board meetings, which she claimed were prompted by her attorney's instruction that "all agreed that it would be best if she stayed away" from meetings. *Id.* Resnick and her husband, a former media spokesman for the Town of Cicero, filed suit against Loren-Maltese, the Town, the Board, and others alleging violations of § 1983 and various state law claims. Defendants moved to dismiss the complaint, arguing in part that they were immune from liability for the state law claims under the Tort Immunity Act. In denying the motion, the court first noted that "the scope of Illinois immunity has not been sufficiently developed by the parties for this court to be comfortable in dismissing claims on those grounds." *Id.* at 1017. The court also stated, without explanation, that the Tort Immunity Act "does not necessarily provide immunity for the conduct relating to the restrictions upon Resnick and her ultimate ouster." *Id.* at 1017. Finally, the court noted that § 2-201 does not apply where, as alleged in the complaint, acts are based on corrupt or malicious motives, a restriction that has since been affirmatively rejected by the Illinois Supreme Court. *Id.* See *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 494, 752 N.E.2d 1090, 1098 (2001)

("[B]ecause the plain language of these provisions does not contain an exception for 'corrupt or malicious motives,' we will not insert one.")

It is not clear from the *Hanania* decision why additional discovery was required to determine whether the defendants were immune from liability for Resnick's "ultimate ouster," aside from the parties' failure to develop the argument. There is no indication that the decision related to the need for clarification as to the actual decisionmaker. Significantly, the court later granted summary judgment in favor of the defendants on the immunity issue, holding that "[s]ince 'decisions of hiring and firing are discretionary acts,' and require the balancing of interests, they warrant immunity under § 2-201." *Hanania v. Loren-Maltese*, 319 F. Supp. 2d 814, 836 (N.D. Ill. 2004) (quoting *Ellis*, 272 F. Supp. 2d at 735-36).

*Alex R. v. Forrestville Valley Community Unit Sch. Dist. No. 221*, on which Stenson relies, is also unhelpful. *Alex R.* involved an allegation that a school district failed to provide a free appropriate public education as required by the Individuals with Disabilities Education Act; it did not involve a decision to discharge an employee. 2003 WL 22764877, at *1. Thus, the court's comment in that case that "[t]he various actions alleged may or may not be either a determination of policy, an exercise of discretion or both" is not instructive here. *Id.* at *4.

Nevertheless, to the extent the Town has not identified the individual(s) responsible for Stenson's discharge, the court declines to dismiss the state law claims on the basis of immunity at this stage of the proceedings. Immunity requires a showing that the relevant public employee held "a position involving the determination of policy or the exercise of discretion" and caused injury based on "an act or omission in determining policy when acting in the exercise of such discretion." 745 ILCS 10/2-201. *See also Snyder*, 167 Ill. 2d 466 at 474, 657 N.E.2d at 993 (an act or omission is discretionary when it is "unique to a particular public office"). The court cannot determine on a motion to dismiss whether these requirements have been satisfied in this case. Moreover, to the

extent the Town has acknowledged that Stenson's discharge was a "policy decision made . . . by Defendant, Town of Cicero" itself, the Tort Immunity Act has no application.

## 2. Illinois Human Rights Act

The Town argues that even if it is not immune from liability under the Tort Immunity Act, the state law claims are nonetheless preempted by the IHRA. The IHRA was designed to "provide uniform procedures and remedies for discrimination claims brought under Illinois law." *Habitat Co. v. McClure*, 301 Ill. App. 3d 425, 436, 703 N.E.2d 578, 586 (1st Dist. 1998). To that end, § 8-111(C) of the Act states that "[e]xcept as provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(C). Thus, the IHRA provides "the exclusive and comprehensive scheme of remedies and administrative procedures to redress human rights violations." *Habitat*, 301 Ill. App. 3d at 436-37, 703 N.E.2d at 586. *See also Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 516, 687 N.E.2d 21, 23 (1997) ("[I]f a common law action is in essence one which seeks redress for a 'civil rights violation' as defined by the Act and there is no basis for the action other than the Act, the circuit court lacks jurisdiction to adjudicate the claim.") Preemption extends to any claim that is "inextricably linked" to alleged civil rights violations. *See Brewer v. Board of Trustees of Univ. of Illinois*, 339 Ill. App. 3d 1074, 1083, 791 N.E.2d 657, 664 (4th Dist. 2003); *Maksimovic*, 177 Ill. 2d at 514, 687 N.E.2d at 22.

The Town argues that Stenson's state law claims all allege civil rights violations within the ambit of the IHRA. The Town focuses on two provisions of the Act in reaching this conclusion. First, § 1-102(E) states that the IHRA is designed, in part, to "promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State." 775 ILCS 5/1-102(E). In addition, § 6-101(A) provides that it is a civil rights violation under the Act to

22

[r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in higher education, discrimination based on citizenship status in employment, or because he or she has made a charge, filed a complaint, testified, assisted or participated in an investigation, proceeding, or hearing under this Act.

775 ILCS 5/6-101(A). In the Town's view, Stenson "alleges the civil rights violation of retaliation against him because he participated or assisted in an investigation into the violation of the civil rights or privileges of Joseph Mario Moreno guaranteed by the Illinois Constitution." (Town Mem., at 10.) Stenson's remaining state law claims, the Town urges, are "inextricably linked" to that state civil rights claim. (Id. at 10-11.)

Stenson insists that his free speech-based civil rights claims are not encompassed within the IHRA, which addresses only discrimination-based civil rights claims. (Pl. Resp., at 15.) The court agrees. The Town has not cited any cases, nor is the court aware of any, that support the theory that the Act prohibits retaliation for the exercise of free speech rights. 775 ILCS 5/6-101(A). To the contrary, the language of the Act demonstrates that it is intended to cover retaliation for opposing discrimination or assisting or participating in an investigation, proceeding, or hearing relating to unlawful discrimination. 775 ILCS 5/6-101(A). See also Luckett v. Jett, 966 F.2d 209, 211 (7th Cir. 1992) ("The IHRA was enacted to create a state cause of action for various civil rights violations amounting to discrimination based on race, sex, handicap, religion, age, unfavorable military discharge, marital status, and other factors.") The IHRA is an anti-discrimination statute and the Town's attempt to extend it to cover the free speech rights at issue here is unavailing.

### C.    § 1983 (Count I)

The Town next seeks dismissal of Stenson's First Amendment retaliation claim (Count I). To state such a claim, Stenson must establish that (1) he engaged in constitutionally protected speech; and (2) the protected speech "played a substantial or motivating factor" in Defendants' decision to retaliate against him. Carreon v. Illinois Dep't of Human Servs., 395 F.3d 786, 791 (7th

23

Cir. 2005) (quoting *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002)). Courts apply a two-step analysis in determining whether speech is constitutionally protected. First, the speech must be on a matter of public concern, which depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Id.* (quoting *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004)). Of these considerations, content is the most important. *Gustafson*, 290 F.3d at 906-07. Second, even if an employee spoke out on a matter of public concern, the government may "restrict the speech if it can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the state, as employer, in promoting effective and efficient public service." *Carreon*, 395 F.3d at 791 (quoting *Gustafson*, 290 F.3d at 909).

The Town argues that Stenson did not speak out on a matter of public concern and that his interest in the speech is outweighed by the Town's interest in running an efficient and productive office. (Town Mem., at 11-12) (citing *Pickering v. Board of Ed. of Township High Sch. Dist. 205*, 391 U.S. 563 (1968).) Stenson insists that his statements to the FBI and the United States Attorney's Office constitute "quintessential First Amendment speech," and that the Town has misconstrued the *Pickering* balancing test. (Pl. Resp., at 16, 22.)

### 1. Matter of Public Concern

#### a. *Gonzalez v. City of Chicago*

The Town first claims that Stenson did not engage in protected speech because he "merely alleged that he communicated facts to the FBI and the U.S. Attorney's Office that he should have included in his original arrest report." (Town Mem., at 13) (citing Cicero General Order No. 26-01-03.B.5.d(21)(a), Ex. 2 to Town Mem.) ("Reports submitted by officers will be truthful and complete.") Specifically, Stenson failed to note in his report that Wolff had called to convey his own observation that the individual in Moreno's vehicle had been driving erratically, possibly due to intoxication.

(Cmplt. ¶¶ 13, 36.) The Town argues that Stenson was required to report his call from Wolff as part of his employment duties and, thus, he did not speak out on a matter of public concern when he ultimately provided that information to federal authorities. (Town Mem., at 14.)

In support of this argument, the Town relies on *Gonzalez v. City of Chicago*, 239 F.3d 939 (7th Cir. 2001). The plaintiff in *Gonzalez* worked as a civilian employee of the Chicago Police Department's Office of Professional Standards ("OPS"). As an OPS investigator, the plaintiff looked into public complaints of police misconduct and brutality by officers in the Department and "was required to summarize his conclusions in a written report." *Id.* at 940. The plaintiff ultimately resigned from OPS and joined the Chicago Police Department as an officer. In that position, he "met with great hostility," apparently due to some of his OPS investigations. *Id.* During his ten weeks of field training, the plaintiff received two negative performance evaluations, which he claimed were "predicated upon falsified subjective information . . . and motivated by retaliation for Plaintiff's exercise of his fair constitutional right of free speech . . . while employed by OPS." *Id.* As a result of the negative evaluations, the plaintiff was fired. He sued the City of Chicago, the Chief of Police, and two of his supervisors, claiming in part that they had retaliated against him for his speech as an OPS investigator in violation of § 1983. *Id.*

The district court granted the defendants' motion to dismiss the § 1983 claim, concluding that the plaintiff's speech at OPS was that of an employee performing his job, and not protected speech by a citizen which touched upon a matter of public concern. *Id.* The Seventh Circuit affirmed, finding that the plaintiff "was clearly acting entirely in an employment capacity when he made th[e OPS] reports." *Id.* at 941. The court recognized that police misconduct is a matter of public concern, but concluded that "the internal reports were simply a summary of [the plaintiff's] findings following his official investigations." *Id.* at 941-42. As such, the speech was "not the protected expression of the public employee." *Id.* at 942.

Stenson argues that *Gonzalez* "does not sweep nearly as broadly as Defendants suggest." (Pl. Resp., at 21.) He cites *Delgado v. Jones*, 282 F.3d 511 (7th Cir. 2002), where the plaintiff, a detective with the Milwaukee Police Department ("MPD"), served as part of a drug entry team that executed a search warrant at a suspected drug house, leading to several arrests. The plaintiff later received a letter from one of the arrestees claiming to have information about the buying and selling of drugs by public school employees, and the patronage of a drug house by a close relative of a public official. According to the letter, the Chief of Police of the MPD was a close personal friend of the public official whose relative frequented the drug house. *Id.* at 514. The plaintiff interviewed the author of the letter to corroborate the details, and wrote a memorandum for his lieutenant summarizing the interview. The memo moved up the chain of command, ultimately reaching the Chief of Police, who responded by transferring the plaintiff to another, less desirable, position. *Id.*

The plaintiff filed suit under § 1983, alleging in part that the Chief of Police and a deputy chief had transferred him in retaliation for his investigation into alleged criminal activities involving a close relative of an elected official. Relying on *Gonzalez*, the defendants argued that the plaintiff's actions did not involve a matter of public concern because he was duty-bound under a Milwaukee ordinance to report all violations of city ordinances to the Chief of Police. *Id.* at 519. The Seventh Circuit disagreed. In the court's view,

> [f]ully divulging this information to [the plaintiff's] superiors may have been consistent with his obligations as a police officer in seeking an independent and objective investigation. And it was hardly in his personal interest to antagonize the Chief. . . But we think [the plaintiff] had considerable discretion about how he communicated the information up the chain of command. His disclosure went far beyond some rote, routine discharge of an assigned duty, as in *Gonzalez*.

*Id.* The court found that the plaintiff's communications with his superiors "were designed not only to convey information of possible crimes, but also *additional facts* that were relevant to the manner and scope of any subsequent investigation." *Id.* (emphasis in original). *Gonzalez*, on the other

hand, involved a public employee's strictly routine duties that were not also a product of some independent discretion or judgment. Id.

In this case, Stenson may have been required to prepare an arrest report relating to Moreno as part of his routine job duties, but it is not clear that he was also required to include in his report any reference to the cell phone calls he received from Wolff and Rowan, calls that apparently implicated them in misconduct. The Town argues that "it is . . . routine for an officer to record in his summary incident report how it was that he came to be aware of suspected criminal activity," and that "truthfulness and completeness of reports is required by Department policy." (Town Reply, at 13.) Stenson alleges, however, that he personally witnessed Moreno's vehicle driving erratically, which was a sufficient basis for him to stop the car, regardless of the earlier phone calls. (Cmplt. ¶ 16.) In any event, the mere fact that Stenson was under a general duty as a police officer to prepare complete reports does not establish that he exercised no discretion or judgment in deciding to report Defendants' alleged misconduct to the FBI and the U.S. Attorney's Office. See Zinnermon, 209 F. Supp. 2d at 910 (police officer's act of reporting excessive force by her partner, "while generally required of all officers, did involve independent discretion and judgment" where it was not a routine task of her job). As the Zinnermon court stated, "[u]ntil we know more about the day-to-day routine of plaintiff's former position, we cannot say as a matter of law that plaintiff has failed to identify speech protected by the First Amendment." 209 F. Supp. 2d at 910.

### b. Personal Motivation

The Town also argues that Stenson's speech is not protected because "he was motivated to speak only out of purely personal concern for himself, and his impression that he was going to be made a scapegoat for the arrest of Joseph Mario Moreno." (Town Mem., at 15) (citing Friend v. Lalley, 194 F. Supp. 2d 803 (N.D. Ill. 2002).) The "public concern" element of the protected speech analysis "must relate to a community concern and is not satisfied by 'merely a personal grievance

27

of interest only to the employee.'" *Carreon*, 395 F.3d at 791 (quoting *Sullivan*, 360 F.3d at 698). In *Friend*, for example, the plaintiff worked as a paid parent volunteer at her son's school. 194 F. Supp. 2d at 806. Her son, who was Caucasian, had problems with peer interpersonal relationships at school, largely attributable to race. The son was disciplined several times for making racial slurs, and on one occasion, an African-American student stabbed the son with a pencil. *Id.* at 806-07. The plaintiff believed that the punishment meted out by the school's principal was unfair to her son and "motivated by [the principal's] worry of upsetting parents of African-American students." *Id.* at 807. The plaintiff spoke out to the school principal and other school administrators every time her son was involved in a disciplinary incident "because she wanted the alleged abuse of her son to stop." *Id.*

After the pencil stabbing incident, the plaintiff filed a police report against the students who had allegedly attacked her son, leading to their arrests. Shortly thereafter, the plaintiff was terminated from her position with the school. *Id.* She filed suit against the school principal alleging that she was fired in retaliation for voicing concerns about student discipline at the school, in violation of the First Amendment. *Id.* at 809. The court held that the plaintiff had not spoken out on a matter of public concern because "[h]er motivation was clearly to improve the situation of her son rather than the situation of the community in general." *Id.* at 811.

The Town claims that, like the plaintiff in *Friend*, Stenson was motivated to communicate with federal authorities solely because he grew concerned that he was being made into a scapegoat, and not out of any desire to protect the public. (Town Mem., at 16.) Stenson acknowledges that he "had at least some personal stake in bringing to the FBI his knowledge about Defendants' misdeeds" – i.e., "to make sure he did not end up blamed falsely." (Pl. Resp., at 18.) He argues, however, that only speech of a purely personal nature is not protected. To be sure, "[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech

28

from the scope of public concern." *Gustafson*, 290 F.3d at 908. *See also Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 941-42 (7th Cir. 2004) ("speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests") (emphasis in original). Stenson claims that at this stage of the proceedings, he has alleged a public motivation sufficient to avoid dismissal.

The Town attempts to distinguish this case from those involving a hybrid personal and public motive, arguing that

> no case involves facts where our Circuit has held that a plaintiff, involved in the conduct forming the subject matter of the speech, who self-suppresses the speech knowing of its relevance and controversy regarding an ongoing public scandal, and who only engages in the speech upon his own personal suspicion that he is about to be made a "scapegoat" for others, had a hybrid motive that qualified as protected speech upon a matter of public concern.

(Town Reply, at 11.) The Town also claims that Stenson has not alleged any public motivation in any event. In the Town's view, Stenson's decision to "remain[] mum through the over two months from the date of Moreno's arrest" leads to "the invariable conclusion . . . that he spoke from purely personal motives." (*Id.* at 12.)

Viewing the complaint in the light most favorable to Stenson, the court cannot say that he has alleged no facts that could support his claim of a public motivation in speaking to federal authorities. As the Seventh Circuit recently noted, a defendant "faces a high evidentiary burden" to establish that speech is not protected due to a plaintiff's personal interest. *Gazarkiewicz*, 359 F.3d at 941-42. Here, Stenson obviously wanted to protect himself from being wrongly blamed for the circumstances surrounding Moreno's arrest, but he also expressed at least some concern about the arrest being politically motivated. (Cmplt. ¶ 26 (alleging that Stenson "asked [Rowan] if the situation was politically motivated because of Moreno's status, and . . . told Rowan he did not want to get caught up in anything political").) *See also Gross v. Town of Cicero*, No. 04 C 489, 2004 WL 2397285, at *7 (N.D. Ill. Oct. 20, 2004) ("Speech is not prevented from being a matter of public

concern simply because there is the mere presence of personal motive.") The Town may ultimately disprove any public motivation for Stenson's speech in light of his delay in reporting the calls from Wolff and Rowan, but the issue cannot be resolved on a motion to dismiss. *See Sullivan*, 360 F.3d at 700 (motive is "a relevant, but not dispositive, factor in considering whether . . . speech addresses a matter of public concern").

## 2. *Pickering* Balancing Test

In a final effort to dismiss the First Amendment claim, the Town argues that its interests in "the efficient and effective administration and performance of law enforcement in Cicero" outweigh Stenson's right to speak out about the Moreno arrest. (Town Mem., at 16.) As noted, even if speech is constitutionally protected, the government may still "restrict the speech if it can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is outweighed by the interest of the state, as employer, in promoting effective and efficient public service." *Carreon*, 395 F.3d at 791 (quoting *Gustafson*, 290 F.3d at 909). A *Pickering* analysis is highly fact-specific, requiring inquiry into a number of related factors, including

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*McGreal v. Ostrov*, 368 F.3d 657, 676 (7th Cir. 2004) (quoting *Gustafson*, 290 F.3d at 909).

The Town claims that the Cicero PD's interests in "disciplining or discharging a sworn employee potentially involved in inappropriate or unprofessional conduct are far greater than Plaintiff's First Amendment right to speak freely concerning his involvement in the same inappropriate or unprofessional conduct." (Town Mem., at 17.) According to the Town, Stenson has alleged facts creating a reasonable inference that he participated in the conspiracy to arrest Moreno,

30

and his failure to include pertinent information in his arrest report "would cause significant cause for concern to any reasonable police department administrator . . . if this individual were allowed to continue to serve." (Id. at 17-18.) For purposes of a motion to dismiss, of course, the more relevant question is whether the allegations create a reasonable inference that Stenson did not participate in that conspiracy. The court concludes the Complaint does pass that test.

As Stenson contends, the Town's argument does not in fact implicate the Pickering balancing test but is, instead, an attempt to offer a justification for Stenson's discharge. (Pl. Resp., at 24.) The Town does argue that Stenson's position required personal loyalty and confidence, but it does not claim that Stenson's speech to the FBI was disruptive to morale, hindered his ability to perform his job, or implicated any of the other Pickering factors. Rather, the Town insists that Stenson should not be "shelter[ed]" from his own misconduct because he disclosed "investigatory information of [that] misconduct" to federal authorities. (Town Reply, at 14.) Assuming Stenson should have mentioned his calls from Wolff and Rowan in his arrest report, the court cannot say at this stage of the proceedings that his right to speak out about Defendants' alleged misconduct is conclusively outweighed by the Town's interest in "promot[ing] the efficiency of the public services." Pickering, 391 U.S. at 568 n.3. Stenson alleges not only that he told the FBI and the U.S. Attorney's Office about the calls, but also that he "recounted the events set forth above" in the complaint (Cmplt. ¶ 57), which may include information regarding Stenson's concern that Himel was representing the Town's interests over his own, and statements and threats Rowan, Wolff, and others made to him in connection with the investigation. Moreover, though the Town would have the court infer that Stenson was involved in the conspiracy to arrest Moreno, it is also reasonable to infer that he was not involved but was set up to take the fall. Drawing all reasonable inferences in Stenson's favor, the Town's motion to dismiss Count I must be denied.

## D. Indemnification (Count V)

Count V of the complaint alleges that the Town must indemnify Stenson "for all actual damages caused by Defendants Betty Loren-Maltese, Thomas Rowan and Glenn Wolff" pursuant to 745 ILCS 10/9-102. (Cmplt. ¶ 84.) Section 9-102 provides that a local public entity must pay "any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment is liable." Relying on *Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997), the Town claims that § 9-102 does not create a private right of action. (Town Mem., at 19.)

In *Wilson*, the plaintiff sued the City of Chicago and a Chicago police officer, alleging that the officer had violated his constitutional rights by using torture to extract confessions from the plaintiff and other criminal suspects. 120 F.3d at 683. A jury acquitted both defendants and the Seventh Circuit affirmed the judgment as to the City but reversed it as to the officer. The City "had already made clear that it would not pay any judgment against [the officer]," so the plaintiff sought to rejoin the City as a defendant under § 9-102. *Id.* The City argued that the claim was premature because § 9-102 only comes into play when a judgment is formally entered against an employee. *Id.* at 684. The Seventh Circuit disagreed.

> Once it became clear, . . . as it did shortly after we remanded the case, that the City would not pay a judgment when and if one was entered against its employee, the plaintiff, in order to expedite the collection of the judgment, could ask the court to enter a judgment against the City that would take effect when and if a judgment against [the officer] was entered and no longer contestable.

*Id.* at 685. *See also Hanania*, 56 F. Supp. 2d at 1019 (though the plaintiffs did not suggest the Town of Cicero would fail to honor its statutory indemnification obligations, they could nonetheless proceed with their § 9-102 claim and "need not wait until judgment is entered.") *But see Cunningham v. Village of Mount Prospect*, No. 02 C 4196, 2002 WL 31628208, at *8 (N.D. Ill. Nov. 19, 2002)

(Guzman, J.) (dismissing § 9-102 claim, but noting that the plaintiff "certainly could rely on this indemnification statute in the event this lawsuit is successful.")

The Town argues that under *Wilson,* an indemnification claim need be pursued only if the Town declines to pay a judgment entered against its officers. This court nevertheless declines to dismiss Stenson's indemnification claim at this time. So far as the court is aware, the Town has not affirmatively represented its willingness to pay any judgment that may be entered, either. Absent such a representation, the Town's motion to dismiss Count V is denied.

### E. Unclean Hands

The Town finally argues that Stenson's entire complaint should be dismissed based on the doctrine of unclean hands. The unclean hands doctrine "precludes a party who has been guilty of misconduct, fraud or bad faith, connected to the matter in the litigation, from receiving any relief from a court of equity." *O'Brien v. Cacciatore,* 227 Ill. App. 3d 836, 846, 591 N.E.2d 1384, 1390 (1st Dist. 1992). The Town claims that Stenson's hands are unclean because he withheld information about his cell phone calls from Wolff and Rowan in his arrest report; failed to disclose the calls to federal authorities during his initial interview; and remained silent for over two months before coming forward with the information. (Town Mem., at 19-20.) According to the Town, "it is a reasonable inference to draw from the totality of the facts pleaded by Plaintiff about his own actions and failures to act that he engaged in a protracted and intentional scheme to withhold . . . material and relevant information" regarding the Moreno arrest, and thus was involved in "the very conspiracy he alleges existed to arrest [Moreno]." (*Id.* at 20) (citing *Hubert v. Consolidated Medical Labs.,* 306 Ill. App. 3d 1118, 716 N.E.2d 329 (2d Dist. 1999).)

The plaintiff in *Hubert* worked in a clinical laboratory that provided medical testing services. A pathologist who had lost a tissue sample called and asked the plaintiff to help him cover it up by creating a new slide with a tissue sample from another patient. *Hubert,* 306 Ill. App. 3d at 1120, 716

33

N.E.2d at 331. After some hesitation, the plaintiff agreed to prepare the false slide. Two days later, however, she told her superiors about the incident and her involvement. Seven months later, the plaintiff was terminated because the department was closing. When the department reopened several months later, the plaintiff applied for a position but was not hired. *Id.* at 1121, 716 N.E.2d at 332. She filed suit against the laboratory alleging that she had been discharged in retaliation for reporting the false tissue incident. The trial court granted summary judgment in favor of the laboratory and the plaintiff appealed. *Id.* at 1124-25, 716 N.E.2d at 334. On appeal, the laboratory argued for the first time that the plaintiff's claim should be barred by the doctrine of unclean hands because it was based on the reporting of her own misconduct. The court agreed, noting that the plaintiff had admitted making a false slide and could not now "profit from her own misconduct by recovering damages." *Id.* at 1126, 716 N.E.2d at 335.

*Hubert* is easily distinguishable from this case in that the parties have not yet completed discovery and it is not clear that Stenson is attempting to profit from his own misconduct. Even assuming it is fair to infer that Stenson was involved in the conspiracy to arrest Moreno, it is also fair to infer that he was not involved but was set up to take the fall. On a motion to dismiss, the court must draw all reasonable inferences in favor of Stenson. *Franzoni*, 300 F.3d at 770. Thus, the Town's motion to dismiss based on the unclean hands doctrine is denied.

**II.    Loren-Maltese**

Loren-Maltese seeks dismissal of Stenson's Complaint on several grounds. She claims that she cannot be liable under § 1983 in her official capacity because it is redundant to sue both her and the Town. She also claims that she cannot be liable under § 1983 in her individual capacity because (1) the Complaint fails to allege that she engaged in, directed, or knew about any misconduct towards Stenson, or (2) she is shielded by qualified immunity. Loren-Maltese further seeks dismissal of the § 1983 and state law conspiracy claims on the grounds that there is no allegation

that she had a meeting of the minds with any of the other Defendants. With respect to the state law claims against her, Loren-Maltese claims that she is immune from liability under the Tort Immunity Act and that the claims are barred by the Act's one-year statute of limitations in any event. Loren-Maltese finally argues that Stenson has not alleged that she engaged in any outrageous conduct sufficient to state a claim for IIED (Count III), and that she cannot be liable for retaliatory discharge (Count VII) because Stenson was employed by the Town and not by her.[25]

## A.   § 1983 (Counts I, IV, and IX)

Loren-Maltese asserts that Stenson has failed to state § 1983 claims against her in her official or individual capacity, and that she is entitled to qualified immunity in any event. The court considers each argument below.

### 1.   Official Capacity

Loren-Maltese first argues that it is redundant for Stenson to sue her in her official capacity because he is also suing the Town for the same misconduct. Where a plaintiff names a local government unit as a defendant in a § 1983 civil rights action, any claim against a government official in his official capacity is redundant. *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) ("[T]he complaint names the mayor as a defendant in his official capacity . . . which is the equivalent of suing the city."); *Borromeo v. City of Chicago*, No. 04 C 4078, 2004 WL 2966925, at *3 (N.D. Ill. Nov. 16, 2004) ("[W]here the plaintiff also names the local government unit as a defendant in the suit, the claim against the individual in his official capacity is redundant.") Stenson

---

[25]      Though Rowan answered the Complaint, he seeks to join in Loren-Maltese's motion that the state law claims against him are barred by the Tort Immunity Act's statute of limitations. (*See* Minute Order of 8/17/04, Doc. No. 58.)

does not respond to this argument and the court agrees that the official capacity claims are properly dismissed not only against Loren-Maltese, but also against Wolff, and Rowan.[26]

## 2. Individual Capacity

With respect to Stenson's claims against Loren-Maltese in her individual capacity, Loren-Maltese argues that there is no allegation that she was personally involved in any improper conduct or had a meeting of the minds with any of the other Defendants, and that she is entitled to qualified immunity from liability.

### a. Personal Involvement

"To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Personal liability may be established through "allegations that [the] constitutional injury was caused at defendant's direction, or with his knowledge or consent." *Hudson v. Sheahan*, No. 99 C 8109, 2000 WL 765065, at *3 (N.D. Ill. June 9, 2000). Loren-Maltese insists that the Complaint fails to allege any such personal involvement because there is nothing to suggest that she "directly engaged in any improper conduct, directed such conduct or possessed knowledge of any such conduct." (L-M Mem., at 4)[27] (citing *Hudson*, 2000 WL 765065, at *3.) According to the complaint, Loren-Maltese was Town President; Moreno was her political opponent; Rowan twice told Stenson that Loren-Maltese knew he (Stenson) had done nothing wrong in arresting Moreno; Himel told Stenson to cooperate with the Town or else Loren-Maltese and the Town would be "pissed off" and he would lose his job; and Loren-Maltese's friend or associate,

---

[26]     Neither Rowan nor Wolff expressly argues that the official capacity claims against them should be dismissed. To the extent Stenson fails to offer any response or objection to Loren-Maltese's argument on this issue, however, the court finds it appropriate to dismiss the other individual Defendants on this basis as well.

[27]     Defendant Betty Loren-Maltese's Memorandum of Law in Support of Her Motion to Dismiss is cited as "L-M Mem., at ___."

Edward Vrdolyak, told Stenson to cooperate with the Town or he would anger Loren-Maltese and lose his job. (Cmplt. ¶¶ 5, 25, 40, 45, 46, 50, 56.) In Loren-Maltese's view, these allegations do not establish "an affirmative link" between her and the alleged deprivation of Stenson's constitutional rights. (L-M Mem., at 4) (citing *Gentry*, 65 F.3d at 561.)

Stenson claims that "there are plenty of sufficient allegations from which Loren-Maltese's personal involvement in the wrongdoing can be readily inferred." (Pl. L-M Resp., at 2.)[28] For example, the Moreno arrest was allegedly designed to benefit Loren-Maltese, who was running against Moreno for Town President. In addition, Vrdolyak, who is, in Stenson's words, Loren-Maltese's "right hand man," warned Stenson that Loren-Maltese would be angry and he would lose his job if he did not cooperate with the Town. Defendants Rowan and Himel similarly invoked Loren-Maltese's name in threatening Stenson with the loss of his job if he failed to cooperate. Stenson argues that these allegations permit the inference that Loren-Maltese was personally involved in depriving Stenson of his constitutional rights. (*Id.* at 2-4) (citing *Moreno*, 2002 WL 31017932, at *3 ("Moreno is not required to plead with exact specificity a conspiracy to deprive him of his constitutional rights, but rather just enough circumstantial evidence [that] may provide adequate proof of a conspiracy.") (internal quotations omitted).)

Loren-Maltese denies that these allegations constitute even circumstantial evidence that she conspired to retaliate against Stenson for exercising his First Amendment rights. In Loren-Maltese's view, the fact that Vrdolyak and Himel warned Stenson that he would anger her and lose his job if he failed to cooperate with the Town is not sufficient to demonstrate that she conspired against him. The court agrees. There is no allegation that Loren-Maltese ever spoke with Vrdolyak or Himel, much less that she told them to threaten Stenson or knew that they planned to do so. *See, e.g.,*

---

[28]     Plaintiff's Response to Defendant Loren-Maltese's Motion to Dismiss is cited as "Pl. L-M Resp., at ___."

37

*McNamara v. Guinn*, Nos. 98 C 7382, 99 C 2853, 2000 WL 1222128, at *3 (N.D. Ill. Aug. 23, 2000) ("In order to establish Section 1983 liability on a conspiracy theory, a plaintiff must show that the defendants reached a mutual understanding to deprive plaintiff of his constitutionally-protected rights.") Even assuming it is reasonable to infer that Loren-Maltese approved a conspiracy to blame Stenson for the malicious prosecution of Moreno, moreover, there is no basis for concluding that Loren-Maltese had any involvement in the decision to discharge him, which is the only harm he allegedly suffered. Nothing in the Complaint ties Loren-Maltese to that decision aside from Stenson's speculation that she generally benefitted from Moreno's arrest. Loren-Maltese's motion to dismiss Counts I, IV, and IX is therefore granted.

### b. Qualified Immunity

Having determined that Stenson has failed to state any § 1983 claims against Loren-Maltese, the court need not address the issue of qualified immunity.

### B. State Law Claims (Counts II, III, VII, and VIII)

In her original motion to dismiss, Loren-Maltese offers several arguments in support of dismissing the state law claims against her. Stenson concedes that the retaliatory discharge claim (Count VII) must be dismissed against Loren-Maltese and the other individual Defendants as well (Rowan and Wolff) because "the only proper defendant in a retaliatory discharge action is the plaintiff's former employer," *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 22, 694 N.E.2d 565, 570 (1998), and Stenson was employed by the Town. (*See* Pl. L-M Resp., at 13.) Thus, Count VII is dismissed as to Loren-Maltese, Rowan, and Wolff.

In an amended motion to dismiss, Loren-Maltese argues that the remaining state law claims against her are barred by the one-year statute of limitations applicable to actions under the Tort Immunity Act. *See* 745 ILCS 10/8-101 ("No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the

38

date that the injury was received or the cause of action accrued.") Stenson was discharged from his position as a Cicero patrol officer on February 20, 2002, but he did not file this lawsuit until September 18, 2003, more than one year later. Stenson agrees that the state law claims against Loren-Maltese are untimely and, for similar reasons, the court concludes that the claims are also untimely as to Rowan and Wolff.[29] In light of this conclusion, the court need not consider Loren-Maltese's other arguments relating to these claims, and Counts II, III, and VIII are dismissed as to her, Rowan, and Wolff without prejudice.

## III.    Himel

Himel argues that the § 1983 claims against him are barred by the two-year statute of limitations. He also claims that Stenson has not adequately alleged that Himel conspired to violate Stenson's constitutional rights or acted under color of law in doing so. Finally, Himel joins in Loren-Maltese's argument that the state law claim against him (civil conspiracy, Count II) is barred by the Tort Immunity Act's one-year statute of limitations.

### A.    Statute of Limitations (Counts I and IX)

Himel contends that Stenson's § 1983 claims accrued more than two years before he filed this lawsuit and are thus untimely.[30] The court considers each claim separately.

---

[29]    The court acknowledges that Wolff has not affirmatively joined in this defense; indeed, Wolff has not responded to the Amended Complaint at all. Nevertheless, Stenson has not sought a default judgment against Wolff or otherwise challenged his failure to respond. Thus, the court finds that dismissal of the state law claims is proper as to Wolff.

The court also notes that it appears that at least some of the state law claims should be barred as untimely with respect to the Town. The Town, however, has not raised this argument in its motion to dismiss, nor joined in the defense as submitted by Loren-Maltese. Thus, the court declines to consider the statute of limitations defense as to the Town.

[30]    The parties agree that the § 1983 claims are governed by a two-year statute of limitations. See Shropshear v. Corporation Counsel of City of Chicago, 275 F.3d 593, 594 (7th Cir. 2001) (Illinois' two-year statute of limitations for personal injury suits, 735 ILCS 5/13-202, "is the statute of limitations that the federal courts 'borrow' for use in section 1983 suits filed in Illinois").

## 1.    First Amendment Retaliation (Count I)

Section 1983 claims "accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993). In determining a claim's accrual date, the court must (1) identify the injury, and (2) determine the date when the plaintiff could have sued for the injury. *Id*. According to Himel, Stenson's First Amendment retaliation claim accrued in February 2001 when Himel allegedly restrained Stenson's free speech by forcing him to invoke his Fifth Amendment right to remain silent during a meeting with lawyers from the Attorney General's Office. (Himel Mem., at 5; Cmplt. ¶ 43.)[31] In addition, it was in February 2001 that Stenson "began to realize that the Town of Cicero was planning on making him the scapegoat." (Cmplt. ¶ 51.) Himel argues that based on these allegations, "it is reasonable to infer that at that point in time, plaintiff understood that he would suffer adverse consequences if he exercised his rights and spoke with the governmental investigators." (Himel Mem., at 5-6.) Under this logic, Stenson had until February 2003 to file his complaint; his September 18, 2003 Complaint is therefore untimely.

Stenson argues that his claim did not accrue until he was discharged on February 20, 2002. Prior to that date, he merely feared a potential injury that was not yet actionable. (Pl. Resp., at 33.) In support of this argument, Stenson directs the court to *Hitt v. Connell*, 301 F.3d 240 (5th Cir. 2002), in which a deputy constable alleged that he was fired in retaliation for exercising his right to associate with a union. *Id*. at 244. The defendant argued that the claim was time-barred because it accrued more than two years before the plaintiff filed suit on February 16, 1999. Though the plaintiff was not fired until March 1997, the defendant argued, his claim accrued when the plaintiff "felt his job was threatened" in October 1995; when he acknowledged in a memo that he was afraid he was going to be fired in December 1995; or when he received a proposed notice of termination

---

[31]    Defendant Frank J. Himel's Motion to Dismiss is cited as "Himel Mem., at __."

on February 14, 1997. *Id.* at 246. In rejecting this argument, the court held that "neither the perception of a threat to one's job, nor fear of being fired, nor even the proposed notice of firing constitutes an actionable *injury*." *Id.* (emphasis in original). Until the plaintiff suffered an adverse employment action, such as discharge, demotion, or formal reprimand, he was not "injured" and his cause of action did not yet accrue. *Id.*

Himel responds that even a de minimis injury is sufficient to start the clock running for purposes of the statute of limitations, and that the clock is "not tolled even when subsequent injuries turn out to be substantially more severe than those felt initially." (Himel Reply, at 6-7)[32] (quoting *Gonzalez v. Entress*, 133 F.3d 551, 554 (7th Cir. 1998).) Himel claims that Stenson suffered "some injury" in February 2001 because he "was aware of defendant Himel's efforts to 'restrain' plaintiff's right of free speech" at that time. (*Id.* at 7.) Stenson's awareness of efforts to restrain his speech, however, is not an actionable injury sufficient to start the running of the clock. Only when Stenson was fired did he sustain an injury for purposes of a First Amendment retaliation claim. *Accord Lawshe v. Simpson*, 16 F.3d 1475, 1478-79 (7th Cir. 1994) (citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981)) (the "statute of limitations on a claim of politically motivated termination runs from the date plaintiffs received notice that a final decision to terminate had been made"). Thus, Stenson's § 1983 claim is not barred by the statute of limitations.

## 2. Conspiracy (Count IX)

Similarly unpersuasive is Himel's assertion that the conspiracy claim is untimely. Section 1983 conspiracy claims accrue when a plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered. *Scherer v. Balkema*, 840 F.2d 437, 440 (7th Cir. 1988). Himel contends that the complaint itself "alleges that the very last act taken by defendant Himel

---

[32]     Defendant Frank J. Himel's Reply in Support of his Motion to Dismiss Plaintiff's Amended Complaint is cited as "Himel Reply, at ___."

occurred in February 2001," which is more than two years before Stenson filed his lawsuit in

September 2003. (Himel Mem., at 6.) As Stenson notes, however, as an alleged co-conspirator

with Defendants the Town, Loren-Maltese, Wolff, and Rowan, Himel must "answer in this action for

all of th[e] tortious conduct of his fellow conspirators which was timely alleged, which includes

Stenson's termination." (Pl. Resp., at 34) (citing *United States v. Barefield*, 6 Fed.Appx. 351, 353,

2001 WL 300714 (7th Cir. 2001)) ("[T]he government is not required to prove any overt acts with

regard to a particular defendant within the limitations period, but only that the conspiracy existed into

the limitations period and that the defendants did not withdraw before that period.")

Himel argues that the overt acts committed by his alleged co-conspirators cannot serve to

extend the limitations period on his own "finite overt conduct" which last occurred in February 2001.

(Himel Reply, at 9.) In support of this argument, Himel quotes the following language from *Scherer*

*v. Balkema*:

> [a] rule allowing plaintiffs in civil conspiracy actions to recover only for overt acts
> alleged to have occurred within the applicable limitations period makes sense. The
> function of statutes of limitations is to "pull the blanket of peace over acts and events
> which have themselves already slept for the statutory period, thus barring proof of
> wrongs imbedded in time-passed events."

840 F.2d at 440 (quoting *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979)).

The plaintiff in *Scherer* alleged that 49 federal agents conspired from 1963 to 1979 to deprive him

of his constitutional rights by engaging in a pattern of attempted entrapment, illegal searches and

seizures, perjury, destruction of evidence, and withholding of documents. *Id.* at 438. The court held

that each overt act triggered its own limitations period for purposes of a conspiracy claim, and that

"characterizing the defendants' separate wrongful acts as having been committed in furtherance

of a 'continuing' conspiracy should not postpone accrual of damage claims based on individual

wrongful acts." *Id.*

42

This case is distinguishable from *Scherer* in that Stenson does not allege a series of separate wrongs but, rather, a single termination in retaliation for speaking to federal authorities about the Moreno arrest. Stenson's discharge falls within the limitations period and, thus, Himel may be responsible as a co-conspirator. *See Barefield*, 6 Fed.Appx. at 353. Himel's motion to dismiss Count IX as untimely is denied.

## B. Sufficiency of Conspiracy Claims (Counts II and IX)

Even if the § 1983 and state law conspiracy claims are timely, Himel claims that Stenson's conspiracy claims must be dismissed because he failed to plead any facts suggesting that Himel was personally involved in his discharge or otherwise agreed to deprive Stenson of his constitutional rights.[33] To state a claim for conspiracy against Himel under § 1983, Stenson must demonstrate that "(1) the private individual and a state official reached an understanding to deprive the plaintiff of [his] constitutional rights and (2) the private individual was a willing participant in joint activity with the state or its agents." *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000). Himel argues that the complaint does not evidence any agreement between him and the Town because it alleges only that he was retained to represent Stenson in a criminal investigation and that he counseled Stenson to invoke his Fifth Amendment rights. (Himel Mem., at 7.) Himel allegedly told Stenson that he could lose his job if he spoke with the FBI, but Himel views this merely as "the advice an attorney gives to his client." (*Id.* at 8) (citing *Polk County v. Dodson*, 454 U.S. 312, 318 (1981) ("[w]ithin the context of our legal system, the duties of a defense lawyer are those of a personal counselor and advocate").)

---

[33] Himel argues that Counts I, II, and IX should all be dismissed for failure to allege a conspiracy but the court disagrees that Count I is properly characterized as a "conspiracy" claim. In any event, as explained below, the court nonetheless agrees that Count I must be dismissed as against Himel.

Stenson insists that he has sufficiently alleged Himel's participation in a conspiracy, noting that he "is not required to plead with exact specificity a conspiracy to deprive him of his constitutional rights, but rather just enough 'circumstantial evidence [that] may provide adequate proof of a conspiracy.'" (Pl. Resp., at 30 (quoting *Moreno*, 2002 WL 31017932, at *3).) For example, Himel was hired by the Town to represent Stenson in the *Moreno* investigation, and he invoked Stenson's Fifth Amendment rights without Stenson's prior knowledge or approval, purportedly as part of a legal strategy. Stenson later overheard Rowan talking to Himel on the telephone and observed Rowan "immediately h[a]ng up the phone when he saw Plaintiff." Finally, Himel refused his client's request to speak with the FBI; became "irate" when Stenson asked for an explanation; told Stenson that "they were not going to cooperate with the FBI because that could get Wolff and Rowan in trouble"; warned Stenson about being a "rat"; and warned Stenson to cooperate with the Town "even if he ran a risk of getting arrested." In Stenson's view, these facts adequately suggest that Defendants "enlisted Himel to pretend to have Stenson's interests in mind, while really protecting Cicero's interests at Stenson's expense." (Pl. Resp., at 29; Cmplt. ¶¶ 38, 39, 42-44, 48-50.)

Himel argues that the Seventh Circuit rejected just such an argument in *Hanania v. Loren-Maltese*. As discussed earlier, the plaintiffs in *Hanania* filed suit under § 1983 alleging that Loren-Maltese, the Town of Cicero, and others fired them in retaliation for speaking out about corruption. One of those "other" defendants was Jerome H. Torshen, an attorney who assisted plaintiff Alison Resnick in obtaining a temporary restraining order to prevent Loren-Maltese from impeding Resnick's duties as Town Collector. 212 F.3d at 355. On Torshen's advice, Resnick agreed to drop the case and signed a settlement agreement that required the Town to refer some of its future legal work to Torshen, which it did. *Id.* When the Town trustees fired Resnick several months later, she called Torshen, "who by this time was happily representing Cicero in other matters." *Id.*

Torshen "finagled" two weeks of vacation time for Resnick and persuaded her to "leave it at that."
*Id.*

In her § 1983 lawsuit, Resnick alleged that Torshen "was in cahoots with the Cicero officials when he convinced Resnick to sign off on a settlement that was not in her interests." *Id.* The district court dismissed the claim, finding that Resnick had not alleged that Torshen was aware of the common purpose to retaliate against Resnick because of her protected speech. *Hanania*, 56 F. Supp. 2d at 1016. The Seventh Circuit affirmed, noting that "the most that can be said about the allegations is that Torshen's actions do not appear to go beyond greed." *Hanania*, 212 F.3d at 357. Torshen may have acted unethically or committed legal malpractice by pushing through a settlement favorable to himself and unfavorable to Resnick, but there was nothing to support the claim that Torshen conspired with the Cicero defendants to deprive Resnick of her constitutional rights. *Id.* at 357-58.

The court agrees that Himel, like Torshen, is alleged to have engaged in unethical or negligent conduct by failing to represent Stenson's best interests. The complaint does not, however, support a claim that Himel conspired to retaliate against Stenson for speaking with federal authorities. Indeed, Stenson fired Himel as his counsel before he ever disclosed any information to the FBI, and his allegedly retaliatory discharge did not occur until one year later. (Cmplt. ¶¶ 52-54, 63.) There are no allegations suggesting that Himel had any further involvement with Stenson or the Moreno investigation after February 2001 and, thus, there is no basis for Stenson's claim that Himel conspired to retaliate against him for exercising his free speech rights.

For similar reasons, Stenson has failed to state a First Amendment retaliation claim against Himel (Count I). There are no allegations suggesting that Himel, a private attorney, had any

involvement in the official decision to discharge Stenson which, as noted, occurred a year after Stenson fired Himel as his counsel. Himel's motion to dismiss Counts I, II, and IX is granted.[34]

## CONCLUSION

For the reasons stated, the Town's motion to dismiss (Docket No. 21-1) is denied in its entirety. The motion to dismiss filed by Loren-Maltese (Docket Nos. 40-1, 50-1) is granted as follows: Counts I, IV, and IX are dismissed against Loren-Maltese, Rowan, and Wolff in their official capacities, and against Loren-Maltese in her individual capacity. Counts II, III, and VIII are dismissed against Loren-Maltese, Rowan and Wolff without prejudice, and Count VII is dismissed against those Defendants with prejudice. Himel's motion to dismiss (Docket No. 25-1) is granted without prejudice.

In light of these determinations, the Town's motion for summary judgment (Docket No. 20) is stricken without prejudice to re-filing. Status conference is set for March 24, 2005, at 9:30 a.m. to establish a briefing schedule on any renewed motion for summary judgment, and for a ruling on Plaintiff's pending motion to compel. Parties are encouraged to discuss settlement.

ENTER:

Dated: March 15, 2005

REBECCA R. PALLMEYER
United States District Judge

---

[34]     Having determined that Stenson failed to state conspiracy or First Amendment retaliation claims against Himel, the court need not address Himel's remaining arguments.